**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION**

| | |
|---|---|
| MARC ALAN REICHBART and CARLA McLAUGHLIN, individually, and on behalf of all others similarly situated, | CASE NO. _____ |
| | **CLASS ACTION** |
| Plaintiffs, | **JURY TRIAL DEMANDED** |
| v. | |
| INTERIM HEALTHCARE INC., | |
| Defendant. | |
| _____/ | |

**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiffs Marc Alan Reichbart and Carla McLaughlin (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, bring this Class Action Complaint against Defendant Interim HealthCare Inc. ("Interim HealthCare" or "Defendant"), and allege as follows based on personal knowledge as to Plaintiffs' own acts and on information and belief as to all other matters:

**NATURE OF THE ACTION**

1.      This is a class action arising from Interim's collection and disclosure of website visitors' sensitive personal and health-related information and electronic communications to Google LLC ("Google") and Microsoft Corporation ("Microsoft") (together, the "Third-Party Recipients"), without prior notice and consent, through tracking technologies embedded in Defendant's website, www.interimhealthcare.com (the "Website").

2.      Interim HealthCare is one of the largest home-based health care and health care staffing organizations in the United States. Founded in 1966 and headquartered in Sunrise, Florida,

1

Interim HealthCare operates a nationwide network of more than 300 independently owned and operated franchise offices that deliver skilled nursing, home health, hospice and palliative care, personal care, pediatric care, and medical staffing services to patients in their homes and communities. Through the Website, Interim HealthCare connects patients and their families with local Interim HealthCare offices and providers, enables users to locate care, research services and medical conditions, request that Interim HealthCare contact them, and submit inquiries.

3.      The Website functions as a care-seeking tool. Users search for Interim HealthCare office and clinic locations by service line (home health care, personal care, hospice, and medical staffing) and by geography; research specific medical services and conditions, including hospice and palliative care, Alzheimer's and dementia care, diabetes, chronic obstructive pulmonary disease, and heart failure; download condition-specific caregiving guides; click to call Interim HealthCare offices; and submit "Contact Us" inquiries. In each instance, users disclose sensitive information about the health conditions and care needs of themselves or the loved ones for whom they seek care.

4.      Unbeknownst to Website visitors, Interim HealthCare has knowingly implemented tracking tools operated by two third-party recipients: the Google Analytics tracker (operated by Google as part of the Google Marketing Platform) and Microsoft Clarity (operated by Microsoft as part of its advertising and analytics ecosystem) (collectively, the "Trackers" and each individually, a "Tracker"). When visitors search for care locations and service lines, research medical services and conditions, download caregiving guides, click to call, submit the Contact Us form, or run free-text searches, Interim HealthCare procures Google and Microsoft to intercept those electronic communications in real time, together with unique identifying cookies that link the communications to the individual user.

5. What aggravates Interim HealthCare's conduct is the timing and manner of these disclosures. Users are never asked to agree to any terms and conditions before they interact with the Website, and are never presented with a cookie banner, pop-up, checkbox, or any clickwrap agreement. Instead, the Website transmits users' location searches, service and condition research, guide downloads, click-to-call events, Contact Us submissions, and search-bar queries to Google and Microsoft in real time as they occur. Interim HealthCare's Privacy Policy and Notice of Privacy Practices appear only as small-print hyperlinks in the Website footer and beneath the "Send Message" button of the Contact Us form—locations users have no occasion to encounter before their information has already been intercepted and transmitted.

6. This interception of private electronic communications occurs without appropriate notice to visitors and without their consent, in violation of (1) the Florida Security of Communications Act, Fla. Stat. § 934.01, *et seq.* ("FSCA"), and (2) the federal Electronic Communications Privacy Act, 18 U.S.C. § 2511 *et seq.* ("ECPA").

7. Under the FSCA, it is unlawful to intentionally intercept, endeavor to intercept, or procure any other person to intercept any wire, oral, or electronic communication without the consent of all parties to the communication. Interim HealthCare violated the FSCA by deliberately embedding tracking technologies on its Website that procured Google and Microsoft to intercept users' private electronic communications—including their location and service-line selections, medical-condition research, Contact Us submissions, and search-bar queries—in real time, without the knowledge or consent of any party to those communications.

8. Under the ECPA, similar protections exist at the federal level. Although the ECPA contains a one-party consent exception, that exception does not apply here because Interim HealthCare procured the interceptions for the purpose of committing a criminal or tortious act—

3

specifically, the unauthorized use and disclosure of individually identifiable health information for commercial advantage in violation of the Health Insurance Portability and Accountability Act ("HIPAA"), 42 U.S.C. § 1320d-6.

9. Further, by systematically harvesting users' sensitive health-related and personal disclosures and exploiting that data for advertising, analytics, and conversion-optimization purposes—without users' knowledge, consent, or compensation— Interim HealthCare has been unjustly enriched at Plaintiffs' and Class Members' expense.

10. Through this action, Plaintiffs seek to hold Interim HealthCare accountable for these privacy violations, to obtain appropriate remedies for affected individuals, and to prevent the continued procurement of interception of electronic communications through Defendant's Website.

**PARTIES**

11. Plaintiff Marc Alan Reichbart is an adult citizen and resident of the State of Florida.

12. Plaintiff Carla McLaughlin is an adult citizen and resident of the State of Florida.

13. Defendant Interim HealthCare Inc. is a corporation organized and existing under the laws of the State of Florida, with its principal place of business at 1551 Sawgrass Corporate Parkway, Suite 230, Sunrise, Florida 33323. Founded in 1966, Interim HealthCare is one of the largest home-care, hospice, and health care staffing organizations in the United States, operating a nationwide network of more than 300 independently owned and operated franchise offices and employing approximately 43,000 people across its system, which generates approximately $5.4 billion in annual revenue. Interim develops, maintains, operates, and controls the Website, including the tracking technologies deployed on it.

**JURISDICTION AND VENUE**

14.     This Court has federal question jurisdiction under 28 U.S.C. § 1331 because this Complaint alleges claims arising under federal law, namely the ECPA, 18 U.S.C. § 2511, *et seq.*

15.     This Court has supplemental jurisdiction over Plaintiffs' state-law claims under 28 U.S.C. § 1367(a) because those claims are so related to the federal claim that they form part of the same case or controversy under Article III of the United States Constitution.

16.     This Court also has jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed Class, and at least one member of the Class is a citizen of a state different from Defendant, which is a citizen of Florida.

17.     This Court has personal jurisdiction over Defendant because Interim HealthCare is a Florida corporation with its principal place of business in Sunrise, Florida, within this District, and operates and controls the Website from Florida. The acts and omissions giving rise to Plaintiffs' claims occurred in and emanated from this District.

18.     Venue is proper in the Fort Lauderdale Division of the Southern District of Florida under 28 U.S.C. § 1391(b)(1) and (b)(2). Defendant resides in this District and maintains its principal place of business at 1551 Sawgrass Corporate Parkway, Suite 230, Sunrise, Florida, which is located in Broward County within the Fort Lauderdale Division. A substantial part of the events or omissions giving rise to the claims occurred in this District, because the tracking conduct at issue is deployed from Interim HealthCare's centralized Website, which is operated, maintained, and controlled from this District, and the Website is accessible to and used by consumers throughout the District.

**FACTUAL ALLEGATIONS**

**A. Overview of Website Tracking on Healthcare Websites**

19.     Many websites employ tracking technologies that collect personal data about users' online activities. These technologies have become ubiquitous across the internet, collecting vast amounts of data about user behavior, preferences, and interests. In the healthcare context, they are particularly concerning because they can capture sensitive medical information, including the types of care a user is researching, the providers a user is seeking, and the health conditions a user or a user's loved one may be experiencing.

20.     The interception of healthcare-related communications through these tracking technologies is especially problematic because it can reveal highly personal and sensitive medical conditions, treatment interests, and care-seeking behaviors to third parties without patients' knowledge or explicit consent.

21.     As detailed below, Interim HealthCare has implemented tracking technologies on its Website that result in Google and Microsoft's unauthorized interception of visitors' electronic communications.

**B. The Google Analytics Tracking Technology**

22.     Google is a multinational technology company headquartered in Mountain View, California. Google operates one of the world's largest online advertising platforms and generates most of its revenue through targeted advertising services. Google's business model depends on collecting vast amounts of user data across its products and services, which it then leverages to deliver targeted advertisements.

23.     The Google Analytics tracker ("Google Analytics") is a web analytics service offered within the Google Marketing Platform that allows website operators to track visitors'

actions on their website in order to measure traffic and engagement, personalize content, and implement targeted advertising. Interim has implemented Google Analytics on its Website.

24.     Google Analytics is a JavaScript-based tracking technology. Website operators implement it by adding a snippet of JavaScript code to their website's source code. Once implemented, the tracker loads automatically and immediately whenever a user visits a page containing the code, and executes in the background without any visible indication to the user, making it invisible to ordinary Website visitors.

25.     Google Analytics intercepts and collects data points about user interactions with a website and transmits details of those interactions to Google via requests to analytics.google.com. Along with these events, the tracker transmits unique identifying cookies, including the __Secure-3PSID, __Secure-3PAPISID, __Secure-3PSIDCC, and NID cookies. The 3PSID, 3PAPISID, and 3PSIDCC cookies allow Google to identify users who are signed into their Google accounts (e.g., via Gmail or Chrome), thereby linking browsing activity on third-party websites to an authenticated Google identity. The NID cookie, by contrast, collects information from users even when they are not signed into a Google account, including users who have never authenticated or are logged out, enabling tracking regardless of authentication status. These cookies enable Google to create comprehensive user profiles and constitute personally identifiable information ("PII"), as they are unique to each user and may be used to identify individuals. The data Google collects through these cookies is used, among other things, to build user profiles and to deliver targeted advertising through the Google Marketing Platform.

C. **The Microsoft Clarity Tracking Technology**

26.     Microsoft is a multinational technology company headquartered in Redmond, Washington. Microsoft collects user data through services including its Clarity analytics tool and its advertising network. Interim HealthCare has implemented Microsoft Clarity on its Website.

27.     Microsoft Clarity is a behavioral analytics tool that tracks user interactions on websites, including which pages users view, where they click, and how they scroll. Clarity's tracking data is connected to Microsoft's broader advertising ecosystem, enabling Microsoft to build targeted advertising profiles based on users' website interactions.

28.     When a user visits a website that uses Microsoft Clarity, information about the user's actions on the site is automatically sent to Microsoft via requests to Microsoft's Clarity servers (including d.clarity.ms), together with the "MUID" (Microsoft User ID) cookie. The MUID cookie serves as a persistent, browser-level identifier that Microsoft uses to recognize the same user across different and unrelated websites that also use Microsoft tracking technologies, enabling Microsoft to consolidate activity into unified behavioral profiles. The MUID cookie contains a unique browser identifier or, when applicable, an identifier associated with the user's Microsoft account, and constitutes PII as it is unique to each user and may be used to identify individuals.

29.     Microsoft's Privacy Policy confirms that it uses the data it collects to "advertise and market to you, which includes sending promotional communications, targeting advertising, and presenting you with relevant offers." Microsoft further states: "In carrying out these purposes, we combine data we collect from different contexts (for example, from your use of two Microsoft products) or obtain from third parties to give you a more seamless, consistent, and personalized experience."

**D. Interim Shares Users' Private Health Information with Third Parties**

30.     Through the Website, users perform a range of activities, including searching for Interim HealthCare clinic and office locations by service line and geography; researching medical services and conditions such as hospice, palliative care, Alzheimer's and dementia care, and diabetes; downloading condition-specific caregiving guides; clicking to call Interim HealthCare offices; submitting the Contact Us form; and running free-text searches. In doing so, users communicate private and personal information via the Website, including protected health information ("PHI"). Unbeknownst to the Website's users, Interim HealthCare surreptitiously shares this private and protected information with Google and Microsoft, without users' consent.

31.     The Website is structured to encourage users to locate care, research Interim HealthCare's services, and contact Interim HealthCare about their care needs. Accordingly, most users interacting with the Website are individuals actively seeking home health, hospice, personal care, or related services—either for themselves or for a family member or other person for whom they are responsible—and are providing health-related and other sensitive personal information in the process.

32.     Specifically, and as documented in the technical records described below, Interim HealthCare shares with Google and Microsoft, without users' knowledge or consent, the following categories of user communications: (i) users' searches for care locations; (ii) users' searches for medical services; (iii) users' searches for medical resources; (iv) users' clicks to Interim's contact phone numbers; (v) users' submissions of the Contact Us form; (vi) search queries users enter into the Website's search bar; and (vii) every page URL a user visits on the Website.

33.     When a user visits the Website, the user's browser sends an HTTP request to the Website's server to load the page. In response, the server returns the webpage, which contains a

9

small piece of code known as a tracker or pixel. The tracker instructs the browser to send the user's IP address, along with other identifying data such as cookies, browser details, and device information, to a third-party tracking service. As documented below, when a user interacts with the Website, the Trackers transmit the contents of those interactions—together with the user's unique identifying cookies—to Google and Microsoft in real time.

### E.  User Searches for a Care Location

34.     The Website allows users to search for Interim HealthCare clinic and office locations by service line and geography. These location searches are transmitted in real time to Google and Microsoft, without users' knowledge or consent.

35.     As shown below, a user begins a location search by clicking the "Find a Location" button in the upper-right corner of the Website's homepage:



*Figure 1: A user clicks the "Find a Location" button on the Website's homepage.*

36.     On the resulting "Find Interim HealthCare Locations" page, the user selects one or more service lines—here, "Has Home Healthcare" and "Has Personal Care"—enters a ZIP code

10

("75001"), and clicks the search button. In doing so, the user discloses both the categories of care being sought and the user's geographic location:



*Figure 2: The user selects service lines, enters a ZIP code, and clicks the search button on the "Find Interim HealthCare Locations" page.*

37.     The user is then presented with a list of matching Interim locations, including their service lines, distance, address, and telephone number. Here, the user selects the first result, "Interim HealthCare of Sherman," which offers home health care and hospice services:



*Figure 3: The user selects the first location result, "Interim HealthCare of Sherman."*

38.     As documented in the technical record below, the user's selected ZIP code and service-line selections are transmitted in real time to Google via a request to analytics.google.com—encoding the user's search query ("Query=75001") and service lines ("HasHomeHealthCareService" and "HasPersonalCareService")—together with the user's __Secure-3PSID, __Secure-3PAPISID, __Secure-3PSIDCC, and NID identifying cookies:

*Figure 4: The user's location search (ZIP code and service-line selections) transmitted to Google with the user's Google identifying cookies.*

39.     The same location search is transmitted in real time to Microsoft via a request to d.clarity.ms, together with the user's MUID identifying cookie, again encoding the user's ZIP code and service-line selections:

*Figure 5: The user's location search transmitted to Microsoft Clarity with the MUID identifying cookie.*

40.     When the user then clicks through to a specific location page—here, the "Interim HealthCare of Sherman" page—that interaction is likewise transmitted to Google, disclosing the specific Interim HealthCare location and services the user is investigating, together with the user's Google identifying cookies:

*Figure 6: The user's click to the Sherman location page transmitted to Google with the user's Google identifying cookies.*

41.     The same location-page interaction is transmitted to Microsoft Clarity in real time, together with the user's MUID identifying cookie:



*Figure 7: The user's click to the Sherman location page transmitted to Microsoft Clarity with the MUID identifying cookie.*

### F.  User Searches for a Medical Service

42.      The Website also shares users' searches for specific medical services with the Third-Party Recipients. In the example documented below, the user hovers over the "Services" menu on the homepage and selects "Hospice":



*Figure 8: The user selects "Hospice" from the Website's "Services" menu.*

43.      On the Hospice page, under the heading "More about our hospice care," the user selects "Palliative Care":



*Figure 9: The user selects "Palliative Care" on the Hospice page.*

44.     On the Palliative Care page, in the "Questions About Palliative Care" section, the user clicks the "palliative care vs. hospice" link, disclosing the specific medical services and end-of-life care options the user is researching:

- **Online Directories:** Use online directories to search for palliative care providers in your area.
- **VA Palliative Care**: Palliative care options for veterans that can be done at home.
- **Pediatric Palliative Care**: This is a service that can be done for pediatric clients.

## Questions About Palliative Care

**Is palliative care the same as hospice care?**

While both palliative care and hospice care focus on improving quality of life, they differ in their approach. Palliative care can be integrated at any stage of an illness, while hospice care is typically reserved for the final stages of life. Learn all about the differences between **palliative care vs hospice**.

**Can I receive palliative care in my home?**

Yes, palliative care can be provided in a variety of settings, including **in home palliative care**, hospitals, nursing homes, and hospices.

**Does palliative care mean giving up hope?**

No, palliative care does not mean giving up hope. It focuses on improving quality of life and managing symptoms while allowing for continued treatment options.

**Can palliative care be combined with curative treatments?**

Yes, palliative care can be integrated with curative treatments. It offers a supportive approach that can help manage symptoms and improve overall well-being during the course of an illness.

**Is palliative care expensive?**

The cost of palliative care can vary depending on factors such as insurance coverage and the specific services provided. Many health insurance plans cover palliative care services. Additionally, there are government programs and charitable organizations that can assist with costs.

*Figure 10: The user clicks the "palliative care vs. hospice" link on the Palliative Care page.*

45.     As documented below, the user's service research is transmitted in real time to Google via a request to analytics.google.com—encoding the specific page visited

("/services/palliative-care/palliative-care-vs-hospice")—together with the user's \_\_Secure-3PSID, \_\_Secure-3PAPISID, \_\_Secure-3PSIDCC, and NID identifying cookies:

*Figure 11: The user's palliative-care service research transmitted to Google with the user's Google identifying cookies.*

46.    The same service research is transmitted in real time to Microsoft Clarity, together with the user's MUID identifying cookie:

*Figure 12: The user's palliative-care service research transmitted to Microsoft Clarity with the MUID identifying cookie.*

## G. User Searches for Medical Resources

47.    The Website also shares users' searches for medical resources with the Third-Party Recipients. In the example documented below, the user clicks the "Resources" button in the homepage navigation:

16



*Figure 13: The user clicks the "Resources" button on the Website's homepage.*

48.     On the Resources page, the user selects the "Diabetes Caregiver's Guide," disclosing the specific medical condition the user is researching:



*Figure 14: The user selects the "Diabetes Caregiver's Guide" from the Resources page.*

49.     On the Diabetes Caregiver's Guide page, the user clicks "Download Guide":



*Figure 15: The user clicks "Download Guide" on the Diabetes Caregiver's Guide page.*

50.     As documented below, the user's interaction with the Diabetes Caregiver's Guide—including the user's click on the "Download Guide" button—is transmitted in real time to Google via a request to analytics.google.com, encoding the page visited ("/resources/diabetes-guide") and the download action, together with the user's Google identifying cookies:



*Figure 16: The user's Diabetes Caregiver's Guide download transmitted to Google with the user's Google identifying cookies.*

51.     The same interaction is transmitted in real time to Microsoft Clarity, together with the user's MUID identifying cookie:



*Figure 17: The user's Diabetes Caregiver's Guide interaction transmitted to Microsoft Clarity with the MUID identifying cookie.*

## H. User Clicks to Call

52.     The Website also shares users' clicks to Interim HealthCare's contact telephone numbers with the Third-Party Recipients. In the example documented below, the user scrolls to the bottom of the homepage and clicks the telephone number "(800) 338-7786," displayed next to Interim HealthCare's corporate address, "1551 Sawgrass Corporate Pkwy, Suite 230, Sunrise, FL 33323":



*Figure 18: The user clicks Interim's contact telephone number in the Website footer.*

53.     As documented below, the user's click-to-call is transmitted in real time to Google via a request to analytics.google.com as a "telephone_interaction" event—encoding the specific

telephone number the user clicked ("(800) 338-7786")—together with the user's Google identifying cookies:



*Figure 19: The user's click-to-call transmitted to Google as a "telephone_interaction" event, encoding the telephone number, with the user's Google identifying cookies.*

### I.   User Submits the Contact Us Form

54.     The Website also shares users' Contact Us form submissions with the Third-Party Recipients. In the example documented below, the user follows the location-search flow described above, clicks through to the "Interim HealthCare of Sherman" location page, and clicks the "Contact Us" button:



*Figure 20: On the Sherman location page, the user clicks the "Contact Us" button.*

55.     The user is presented with a contact form that asks the user to identify what services the user is interested in and to provide additional details about the user's inquiry:



*Figure 21: The Contact Us form, which collects the user's service interest and details of the user's inquiry.*

56.     After completing the form, the user clicks "Send Message." A reference to Interim HealthCare's Privacy Policy appears in small print only at this final step, beneath the "Send Message" button—after the user has completed the form:

21



*Figure 22: The user clicks "Send Message" to submit the Contact Us form. A reference to the Privacy Policy appears only here, beneath the button.*

57.     As documented below, the user's form submission is transmitted in real time to Google via a request to analytics.google.com, together with the user's Google identifying cookies:



*Figure 23: The user's Contact Us form submission transmitted to Google with the user's Google identifying cookies.*

58.     The same form submission is transmitted in real time to Microsoft Clarity, together with the user's MUID identifying cookie:

22



*Figure 24: The user's Contact Us form submission transmitted to Microsoft Clarity with the MUID identifying cookie.*

## J.  User's Free-Text Search

59.     The Website provides a search bar that allows users to search for services, locations, and conditions. In the example documented below, the user enters the search term "Alzheimer" into the homepage search bar and clicks the search button:



*Figure 25: The user enters the search term "Alzheimer" into the Website's search bar.*

60.     The user is presented with search results for "Alzheimer," including Interim HealthCare's "Hospice & Alzheimer's Disease" and "Patient-centered Alzheimer's and Dementia Care" services, disclosing the specific medical condition the user is researching:

23



*Figure 26: The Website's search results for "Alzheimer."*

61.     As documented below, the user's free-text search query is transmitted in real time to Google via a request to analytics.google.com—encoding the user's specific search term ("/search?query=Alzheimer")—together with the user's Google identifying cookies:



*Figure 27: The user's free-text search query transmitted to Google, encoding the search term, with the user's Google identifying cookies.*

62.     The same search query is transmitted in real time to Microsoft Clarity, together with the user's MUID identifying cookie:

*Figure 28: The user's free-text search query transmitted to Microsoft Clarity with the MUID identifying cookie.*

### K. User Browsing Activity Across All Pages of the Website

63.    The interception of users' electronic communications is not limited to the interactions described above. Every page URL a user visits on the Website—including pages describing hospice, palliative care, home health care, personal care, specific medical conditions, and other health-related content—is transmitted to Google and Microsoft in real time, together with their respective unique identifying cookies. Through these transmissions, Google and Microsoft learn not only that the user visited the Website, but the specific medical topics, conditions, and care options the user was researching.

64.    This Complaint focuses on Google and Microsoft because those are the tracking systems documented here. Discovery may reveal additional third-party recipients or additional Google and Microsoft tracking products deployed on the Website, including advertising products within the Google Marketing Platform and Microsoft's advertising network.

### L. Defendant's Responsibility for the Interception of Electronic Communications

65.    Although the Trackers perform the technical functions of intercepting electronic communications, Interim HealthCare bears full legal responsibility for these actions under the FSCA and ECPA as the entity that procured Google and Microsoft to intercept these communications.

25

66.     Interim HealthCare knowingly made the affirmative decision to implement Google Analytics and Microsoft Clarity on its Website. This implementation was deliberate and required Defendant, or persons acting on its behalf, to configure and deploy the Trackers on the Website. Without Interim HealthCare's implementation and continued operation of this code, the Third-Party Recipients would not have received the electronic communications at issue.

67.     Interim HealthCare controls, or has the practical ability to control, which pages and events on its Website contain or trigger the tracking code. Interim HealthCare could exclude tracking from sensitive pages and form events—including its location-search, service-research, Contact Us, and search functions, where health-related information is disclosed—yet chose to deploy tracking on precisely those functions.

**M. Interim HealthCare's Privacy Disclosures Do Not Authorize the Tracking Conduct**

68.     Interim HealthCare's Website includes links to a Privacy Policy and a Notice of Privacy Practices in the footer of the Website's pages, and a reference to the Privacy Policy beneath the "Send Message" button of the Contact Us form. Users are not required to affirmatively agree to any of these documents before searching for locations or services, downloading guides, clicking to call, submitting the Contact Us form, or otherwise interacting with the Website.

69.     Far from authorizing the tracking conduct, Interim HealthCare's Privacy Policy affirmatively represents the opposite. The Privacy Policy states that Interim HealthCare "is the sole owner of the information collected on this site" and that Interim HealthCare "will not sell, share, or rent this information to others in ways different from what is disclosed in this statement." With respect to cookies, the Privacy Policy represents that "[u]sage of a cookie is not linked to any personally identifiable information while on our site." A reasonable user reading these representations would understand that his or her sensitive personal and health-related information

26

is not being shared with third-party advertising and analytics companies—precisely the opposite of what Interim HealthCare's tracking conduct accomplishes.

70.     To the extent Interim HealthCare points to its Notice of Privacy Practices, that document does not cure the problem and instead compounds it. The Notice contains statements that are inconsistent with the Privacy Policy, including that Interim HealthCare may "[m]arket our services and sell your information." A user reviewing both documents could not reasonably ascertain whether, and under what circumstances, the Website shares or sells his or her personally identifiable information to third parties. Contradictory and confusing disclosures cannot supply the knowing, informed consent that the FSCA and ECPA require, especially where the Privacy Policy itself states that Interim HealthCare will not sell data "in ways different from what is disclosed in this statement."

71.     Even setting aside their substantive deficiencies, Interim HealthCare's privacy disclosures cannot constitute consent because they are presented as a passive browsewrap arrangement. The Privacy Policy and Notice of Privacy Practices are accessible only through small-print hyperlinks in the Website footer and beneath the "Send Message" button, among numerous other links. Users are not required to take any affirmative action—such as clicking "I agree" or checking a box—before their data is collected and disclosed, and are deemed to "assent" merely by using the Website. Browsewrap terms are enforceable only where the hyperlink to the terms is conspicuous enough to put a reasonably prudent person on inquiry notice before engaging with the website. Interim HealthCare footer links and post-submission references fail this test.

72.     Even if enforceable, Interim HealthCare's privacy disclosures do not operate as consent to Interim HealthCare's use of the Trackers to intercept users' private health-related and personal information and transmit it to third-party advertising and analytics companies. Consent

27

is limited to the specific conduct authorized, and a reasonable person would not understand a generic privacy policy—let alone one affirmatively stating that cookie usage "is not linked to any personally identifiable information" and that Interim "will not sell, share, or rent" user information—to authorize the real-time interception and transmission of the user's location and service searches, medical-condition research, Contact Us submissions, and search-bar queries to Google and Microsoft for advertising and analytics purposes.

**N. Interim's Conduct Violates HIPAA**

73.     Interim HealthCare holds itself out as a healthcare organization that provides home health, hospice, palliative, and personal care services, coordinates care through its network of offices and providers, and maintains information concerning patients' health conditions, care needs, and services sought. Interim HealthCare publishes a Notice of Privacy Practices on its Website, indicating that Interim HealthCare recognizes obligations under HIPAA in connection with its role.

74.     Interim HealthCare operates as a franchisor overseeing a nationwide network of more than 300 independently owned and operated healthcare franchise offices. To the extent Interim HealthCare directly provides or coordinates healthcare services, it qualifies as a covered entity under HIPAA within the meaning of 45 C.F.R. § 160.103. Alternatively, and at minimum, Interim HealthCare qualifies as a business associate under 45 C.F.R. § 160.103, because it operates the centralized Website through which users search for services, select care locations and providers, submit Contact Us inquiries, and access health-related resources, and thereby creates, receives, maintains, or transmits PHI on behalf of its franchisee covered entities. Business associates are independently subject to the same prohibitions on unauthorized disclosure of PHI as covered entities. *See* 45 C.F.R. § 164.502(a). Interim HealthCare's embedding of third-party

28

tracking code that transmits PHI to Google and Microsoft is an unauthorized disclosure regardless of whether Interim HealthCare's HIPAA obligations arise from its status as a covered entity or as a business associate.

75. PHI is defined as "individually identifiable health information" that is (i) transmitted by electronic media; (ii) maintained in electronic media; or (iii) transmitted or maintained in any other form or medium. 45 C.F.R. § 160.103. Individually identifiable health information ("IIHI") is health information that is (1) created or received by a health care provider, health plan, employer, or health care clearinghouse; (2) relates to an individual's past, present, or future physical or mental health or condition, or to the provision of or payment for health care; and (3) either identifies the individual or provides a reasonable basis to believe the individual can be identified. 45 C.F.R. § 160.103.

76. When users interact with the Website—searching for care locations and service lines, researching hospice, palliative care, Alzheimer's and dementia care, diabetes, and other conditions, submitting Contact Us inquiries, and running condition-specific searches—they disclose information relating to the past, present, or future physical or mental health or condition of themselves or the individuals for whom they seek care, and to the provision of health care. This information is collected by Interim HealthCare in the context of users seeking care and satisfies the first two prongs of the IIHI definition.

77. The cookies and device identifiers transmitted alongside users' health-related interactions satisfy the third prong. Under 45 C.F.R. § 164.514(b)(2)(i), a "unique identifying number, characteristic, or code"—including cookies and device identifiers—qualifies as an identifier. The Google Analytics cookies (__Secure-3PSID, __Secure-3PAPISID, __Secure-3PSIDCC, and NID) and the Microsoft MUID cookie are precisely such unique identifiers. When

29

those identifiers travel in the same transmission as users' medical-condition research, service-line selections, and Contact Us submissions, the combined dataset becomes individually identifiable and therefore constitutes PHI. *See Kane v. Univ. of Rochester,* 2024 WL 1178340 (W.D.N.Y. Mar. 19, 2024) (holding that the IIHI threshold can be satisfied where transmitted data, though seemingly scrambled, can be decoded by the recipient to identify the individual).

78.     The health-related information intercepted from Interim HealthCare's Website is highly sensitive. It reveals the specific care services and conditions users are researching—including hospice and end-of-life care, palliative care, Alzheimer's and dementia care, and diabetes care—and, through the location and Contact Us functions, the specific providers and offices from which users seek care. The disclosure of this information to advertising and analytics companies exposes users to privacy invasions and to the risk of stigma, discrimination, and targeted exploitation.

79.     Under HIPAA, it is unlawful for a covered entity or business associate to knowingly disclose individually identifiable health information without authorization with intent to sell, transfer, or use such information for commercial advantage, personal gain, or malicious harm. 42 U.S.C. § 1320d-6. Interim HealthCare did not deploy the Trackers merely for passive website maintenance. It deployed and used them for commercial purposes, including advertising, analytics, conversion measurement, retargeting, audience-building, and optimization of its care-referral and lead-generation funnel. Interim HealthCare's deployment of the Trackers, which results in the automatic transmission of users' PHI to Google and Microsoft for those commercial purposes, constitutes an unauthorized disclosure of PHI in violation of HIPAA.

80.     Upon information and belief, Interim HealthCare has not executed HIPAA-compliant Business Associate Agreements with Google or Microsoft for the tracking activities

30

described herein, and has not obtained the HIPAA-compliant authorizations necessary to permit such disclosures for non-treatment purposes.

81. Interim HealthCare had actual and constructive knowledge that its deployment of third-party trackers on its Website violated HIPAA. In December 2022, and as updated in March 2024, the U.S. Department of Health and Human Services, Office for Civil Rights, issued guidance expressly warning HIPAA-covered entities and business associates that the use of third-party tracking technologies on websites—including pixels and analytics tools—that transmit PHI to third-party vendors without a valid Business Associate Agreement constitutes an unauthorized disclosure in violation of HIPAA. Interim HealthCare, which publishes its own Notice of Privacy Practices and holds itself out as handling health information subject to HIPAA, cannot credibly claim ignorance of this well-publicized federal guidance. Interim HealthCare's continued deployment of the Trackers reflects a knowing and deliberate choice to prioritize advertising and analytics benefits over its legal obligations.

82. The interceptions here do not depend on the transmission of IP addresses alone. Interim HealthCare transmits the actual contents of users' communications—their search queries, service-line and location selections, medical-condition research, guide downloads, click-to-call events, and Contact Us submissions—together with persistent, unique identifying cookies that link those communications to the individual user. Interim HealthCare's conduct therefore falls squarely within HIPAA's protections and supplies the independent unlawful purpose required for the ECPA's crime-tort exception.

**O. Plaintiffs' Specific Experiences**

83. Plaintiff Marc Alan Reichbart is a Florida resident who suffers from a cardiac condition. On repeated occasions over approximately the past two years, Mr. Reichbart visited the

Website to research and locate care in connection with his health condition. Mr. Reichbart accessed the Website using the Google Chrome browser on his Android mobile device. He did not use ad blockers, "incognito" mode, or a virtual private network, meaning the Trackers embedded on the Website were fully operational during his visits.

84.     Before interacting with the Website, Mr. Reichbart was not presented with any cookie banner, pop-up, checkbox, clickwrap, or other affirmative request for permission to disclose his searches, form submissions, or health-related browsing information to Google or Microsoft.

85.     During his visits, Mr. Reichbart used the Website to search for Interim HealthCare care locations and to research specialized care in connection with his medical condition, and he submitted the Website's Contact Us form. In doing so, Mr. Reichbart disclosed information concerning his health condition and care needs, his geographic location, and the categories of care he was seeking. As documented above, those location searches, service searches, and the Contact Us submission were intercepted in real time and transmitted to Google, together with Mr. Reichbart's Google identifying cookies, and to Microsoft, together with his MUID identifying cookie, all without Mr. Reichbart's knowledge or consent.

86.     Following his interactions with the Website, Mr. Reichbart received email correspondence from Interim HealthCare, corroborating his use of the Website and his submission of the Contact Us form.

87.     Plaintiff Carla McLaughlin is a Florida resident and a nursing professional who has spent her career caring for elderly patients, assisting them with their medical and personal-care needs in a close and intimate capacity. Ms. McLaughlin previously worked for Interim HealthCare as a certified nursing assistant approximately ten years ago.

32

88.     Within the past several months, Ms. McLaughlin visited the Website. She accessed the Website using the Google Chrome browser on her Android mobile device, and did not use ad blockers, "incognito" mode, or a virtual private network, meaning the Trackers embedded on the Website were fully operational during her visit. She used the Website for two related purposes: to explore employment opportunities with Interim HealthCare, and to assist one of her elderly clients in locating and arranging home health care.

89.     Before interacting with the Website, Ms. McLaughlin was not presented with any cookie banner, pop-up, checkbox, clickwrap, or other affirmative request for permission to disclose her searches, form submissions, or browsing information to Google or Microsoft.

90.     During her visit, Ms. McLaughlin used the Website to search for a specific Interim HealthCare care location and to research and request home health care services on behalf of her client, including twelve-hour in-home care. She also clicked to call an Interim HealthCare telephone number and submitted the Website's Contact Us form, although she was unable to reach anyone at Interim HealthCare through either the telephone number or the form. In doing so, Ms. McLaughlin disclosed information concerning the health-related care needs of the client for whom she sought care, the geographic location of the care sought, and the categories of care being requested. As documented above, those location and service searches, the click-to-call, and the Contact Us submission were intercepted in real time and transmitted to Google, together with Ms. McLaughlin's Google identifying cookies, and to Microsoft, together with her MUID identifying cookie, all without Ms. McLaughlin's knowledge or consent.

91.     Although Ms. McLaughlin's recent use of the Website concerned care for one of her clients rather than her own medical condition, and although she was also exploring potential employment, the Trackers intercepted the contents of her electronic communications with the

33

Website in the same manner, and through the same mechanism, described above. The FSCA and the ECPA protect against the interception of the contents of a party's electronic communications regardless of whether the communication concerns the user's own health, and the health-related information Ms. McLaughlin transmitted concerned an identifiable individual for whom she was seeking care—precisely the category of sensitive communication the Website's tracking captures and transmits to the Third-Party Recipients. Ms. McLaughlin was a party to those communications, and their interception without her knowledge or consent is actionable regardless of the purpose for which she used the Website.

92.     Because Interim HealthCare deployed the Trackers on its Website, the Third-Party Recipients intercepted and received Plaintiffs' sensitive health-related and personal information and electronic communications without their knowledge or consent. At no time did Plaintiffs consent to the interception of their communications with Defendant through the Website by Google or Microsoft, or to Defendant enabling those companies to access or intercept such information. Plaintiffs reasonably expected that their communications with Defendant were solely between themselves and Defendant and would not be transmitted or disclosed to third parties.

## INJURY TO PLAINTIFFS AND CLASS MEMBERS

93.     Interim HealthCare's procurement of the unauthorized interception of Website user communications has caused actual harm to Plaintiffs and Class Members in multiple ways.

94.     **Invasion of Privacy.** The health-related and personal information disclosed through users' location searches, service and condition research, Contact Us submissions, and search-bar queries—including the specific care services and medical conditions users research for themselves or their loved ones—is among the most private information an individual possesses. Its interception and disclosure to advertising and analytics companies can result in significant

embarrassment, stigma, and discrimination. Plaintiffs and Class Members have suffered an invasion of privacy through the unauthorized interception of their electronic communications and health-related disclosures, violating their reasonable expectation that their interactions with Interim would remain private.

95. **Loss of Data Value.** Plaintiffs and Class Members have been deprived of the economic value of their personal data. In today's digital economy, personal data—especially health-related information—has significant commercial value, as demonstrated by Interim HealthCare's own use of that data for advertising, analytics, and lead generation.

96. **Diminished Confidence in Healthcare Privacy.** The unauthorized interception of Plaintiffs' and Class Members' communications has undermined their ability to freely and confidentially seek medical information, research care options, and arrange care for themselves and their loved ones without fear that their activities and disclosures are being intercepted by third parties.

97. **Risk of Further Use of Intercepted Data.** Once intercepted by Google and Microsoft, Plaintiffs' and Class Members' data is beyond their control. This creates an ongoing risk that their sensitive health-related information may be further processed, combined with other data sources, or used by additional third parties, causing continued and future harm.

98. **Statutory Injury.** Independent of the above harms, Interim HealthCare's violations of the FSCA and ECPA have caused Plaintiffs and Class Members to suffer statutory injury, entitling them to the remedies provided by law, including statutory damages.

## CLASS ACTION ALLEGATIONS

99. Plaintiffs bring this action on behalf of themselves and all others similarly situated pursuant to Rules 23(a), 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

100.    The Nationwide Class that Plaintiffs seek to represent is defined as follows:

All individuals residing in the United States who visited Interim's Website and whose electronic communications were intercepted by one or more third-party tracking technologies deployed by Interim HealthCare, including Google Analytics and/or Microsoft Clarity, within the applicable statute of limitations period (the "Nationwide Class").

101.    The Florida Class that Plaintiffs seek to represent is defined as follows:

All individuals residing in Florida who visited Interim's Website and whose electronic communications were intercepted by one or more third-party tracking technologies deployed by Interim, including Google Analytics and/or Microsoft Clarity, within the applicable statute of limitations period (the "Florida Class").

102.    Together, the Nationwide Class and the Florida Class are referred to as the "Class."

103.    Excluded from the Class are: (a) Defendant, its officers, directors, affiliates, legal representatives, employees, successors, subsidiaries, and assigns, and its franchisees; (b) Google and Microsoft, and their officers, directors, affiliates, legal representatives, employees, successors, subsidiaries, and assigns; (c) any governmental entities; (d) the judge(s) to whom this case is assigned, their immediate family members and staff, and the attorneys for the parties and their staff; and (e) any jurors assigned to this case.

104.    Plaintiffs reserve the right to modify, change, or expand the Class definitions based upon discovery and further investigation.

105.    **Numerosity.** The Class is so numerous that joinder of all members is impracticable. Interim HealthCare operates one of the largest home-care and healthcare-staffing networks in the United States, and its Website receives hundreds of thousands of unique visitors each year. Based on Website-traffic data, the Website received approximately 442,900 unique U.S. visitors over the past two years to its location-finder function alone, and the number of individuals whose communications were intercepted by the Trackers during the relevant period is estimated to be in

36

the hundreds of thousands—approximately 265,740 or more. The precise number and identities of Class Members are within Defendant's and the Third-Party Recipients' records.

106.   **Ascertainability.** The Class is ascertainable because its members can be identified through objective criteria using records maintained by Defendant and third parties. Interim HealthCare's web-server logs, Google Analytics account data, and Microsoft account data contain records of Website visitors whose electronic communications were intercepted by the Trackers during the applicable limitations period, including IP addresses, cookie identifiers, timestamps, and the specific pages, searches, and form submissions involved. In addition, Interim HealthCare collects names, contact information, and inquiry details from users who submit the Contact Us form, and Interim HealthCare's customer-relationship and lead records, together with the advertising and analytics account records of the Third-Party Recipients obtainable through discovery, provide objective, reliable means of identifying Class Members.

107.   **Commonality and Predominance.** There are questions of law and fact common to the Class that predominate over any questions affecting only individual members. These common questions include:

(a)   Whether Interim HealthCare implemented the Trackers on its Website;

(b)   Whether the Trackers intercepted Website users' electronic communications;

(c)   Whether Interim HealthCare procured, enabled, and aided and abetted the interception of Website users' electronic communications;

(d)   Whether Interim HealthCare obtained Website users' consent to procure the interception of their electronic communications;

(e)   Whether Interim HealthCare's conduct violated Fla. Stat. § 934.03;

(f)   Whether Interim HealthCare's conduct violated 18 U.S.C. § 2511;

(g)  Whether Interim HealthCare has been unjustly enriched through its conduct;

(h)  Whether Plaintiffs and Class Members are entitled to damages and other monetary relief, and if so, in what amount; and

(i)  Whether Plaintiffs and Class Members are entitled to equitable relief, including injunctive relief.

108.  These common questions predominate over any individualized issues because Plaintiffs' claims challenge Interim HealthCare's uniform, centralized conduct—the deployment of identical tracking code across its Website, including its location-search, service, resources, Contact Us, and search functions—rather than any individualized interaction between Interim and a particular Class Member. The Trackers operated in the same manner on every page of the Website, intercepting the same categories of data and transmitting that data to the same third parties using the same cookies and identifiers, regardless of which user visited the site. Liability can therefore be established on a class-wide basis through common proof, including Interim HealthCare's Website source code, its arrangements with Google and Microsoft, and the technical operation of the Trackers.

109.  Any individualized questions—such as the specific pages a given Class Member visited or the precise dates of their visits—do not predominate.Courts routinely hold that predominance is satisfied in healthcare website tracking cases because the core liability inquiry focuses on the defendant's uniform deployment of tracking technology without consent, not on the content of any individual user's browsing session.

110.  **Typicality.** Plaintiffs' claims are typical of the claims of the other Class Members. Plaintiffs and Class Members all visited Interim HealthCare's Website and had their electronic

communications intercepted by the Third-Party Recipients without their consent, arising from the same practices and course of conduct and based on the same legal theories.

111. **Adequacy.** Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs have no interests adverse or antagonistic to those of the Class, and have retained counsel experienced in complex class action litigation, including class actions involving privacy violations, unlawful data collection, and the interception of electronic communications in the healthcare context. Plaintiffs' counsel have the resources, expertise, and commitment to prosecute this action vigorously through discovery, class certification, trial, and any appeals.

112. **Superiority.** A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. The damages suffered by many Class Members may be relatively small compared to the burden and expense of individual litigation, making it difficult for Class Members to individually redress the wrongs done to them. Prosecution of separate actions would create a risk of inconsistent or varying adjudications. A class action provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

113. **Injunctive and Declaratory Relief.** Interim has acted or refused to act on grounds generally applicable to the Class as a whole, making final injunctive relief and corresponding declaratory relief appropriate with respect to the Class as a whole under Rule 23(b)(2).

114. **Issue Certification.** Alternatively, Plaintiffs seek certification of the common issues identified above under Rule 23(c)(4). Certification of those issues would materially advance the litigation, promote uniform adjudication of Defendant's common conduct, and narrow any individualized questions that may remain after the class-wide issues are resolved.

**CAUSES OF ACTION**

**COUNT I**
**Violation of the Florida Security of Communications Act**

**(Fla. Stat. § 934.03)**
**(On Behalf of Plaintiffs and the Florida Class)**

115.    Plaintiffs incorporate paragraphs 1–114 above as if fully set forth herein and bring this Count individually and on behalf of the proposed Florida Class.

116.    The FSCA prohibits intentionally intercepting, endeavoring to intercept, or procuring any other person to intercept or endeavor to intercept any electronic communication. Fla. Stat. § 934.03(1)(a). The FSCA is an all-party consent statute, requiring the consent of all parties to the communication. Fla. Stat. § 934.03(2)(d).

117.    The FSCA defines "intercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." Fla. Stat. § 934.02(3). It defines "contents" as "any information concerning the substance, purport, or meaning of that communication." Fla. Stat. § 934.02(7). The FSCA was "designed to protect precisely the information at issue in this case—private medical information." *W.W. v. Orlando Health, Inc.,* 2025 WL 722892, at *4 (M.D. Fla. Mar. 6, 2025).

118.    The Trackers deployed on Interim's Website constitute "electronic, mechanical, or other device[s]" within the meaning of the FSCA. Unlike session-replay technology that merely records mouse movements, the Trackers here actively intercept and transmit the contents of users' communications, including users' location and service-line selections, medical-condition research, Contact Us submissions, and search-bar queries.

119.    The transmissions between Plaintiffs and Class Members and Interim HealthCare's Website constitute "electronic communications" within the meaning of the FSCA because they are transfers of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system. Fla. Stat. § 934.02(12).

40

120. The Trackers intercept the "contents" of Plaintiffs' and Class Members' electronic communications, not merely routing or addressing information. The specific search queries, service-line and location selections, and Contact Us submissions transmitted to Google and Microsoft plainly concern the "substance, purport, or meaning" of the user's communication within the meaning of Fla. Stat. § 934.02(7). Likewise, the URLs of the service, condition, and resource pages a user visits encode the specific medical services and conditions being researched and therefore constitute "contents" rather than mere routing information. *See W.W. v. Orlando Health, Inc.,* 2025 WL 722892, at *4–5 (holding that URLs reflecting medical services sought constitute "contents" under the FSCA); *Goldstein v. Costco Wholesale Corp.,* 559 F. Supp. 3d 1318, 1321 (S.D. Fla. 2021) (URLs may constitute "contents" where they reveal substantive information about a user's activity). Interim HealthCare's conduct is readily distinguishable from the collection of "basic analytic data" in a "generic commercial setting" at issue in *Jacome v. Spirit Airlines, Inc.,* 2021 WL 3087860 (Fla. Cir. Ct. June 17, 2021), because the data intercepted here is confidential, health-related information the FSCA was enacted to protect.

121. Interim HealthCare intentionally procured Google and Microsoft to intercept these electronic communications by deliberately implementing the Trackers on its Website. Plaintiffs and Class Members did not consent to this interception.

122. As a direct result of Interim HealthCare's violations, Plaintiffs and Class Members are entitled to: (a) actual damages, or liquidated statutory damages computed at the higher of $100 per day for each day of violation or $1,000; (b) punitive damages; and (c) reasonable attorneys' fees and costs of litigation. Fla. Stat. § 934.10.

123. Plaintiffs and Class Members are also entitled to injunctive relief to prevent Interim HealthCare from continuing to deploy the Trackers to intercept their electronic communications without proper consent.

## COUNT II
### Violation of the Electronic Communications Privacy Act
### (18 U.S.C. § 2511 et seq.)
### (On Behalf of Plaintiffs and the Nationwide Class)

124. Plaintiffs incorporate paragraphs 1–114 above as if fully set forth herein and bring this Count individually and on behalf of the proposed Nationwide Class.

125. The ECPA prohibits the intentional interception of electronic communications and the procuring of any other person to intercept electronic communications. 18 U.S.C. § 2511(1)(a).

126. The ECPA provides a private right of action to any person whose electronic communications are intercepted, disclosed, or intentionally used in violation of 18 U.S.C. § 2511(1)(a). 18 U.S.C. § 2520(a).

127. The transmissions between Plaintiffs and Class Members and Interim's Website are transfers of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce, and therefore constitute "electronic communications" within the meaning of the ECPA. 18 U.S.C. § 2510(12).

128. The Trackers intercepted the "contents" of Plaintiffs' and Class Members' electronic communications within the meaning of the ECPA, for the same reasons set forth above with respect to the FSCA.

129. Although the ECPA contains a one-party consent exception, 18 U.S.C. § 2511(2)(d), that exception does not apply here because the communications were intercepted for the purpose of committing a criminal or tortious act in violation of the laws of the United States.

Specifically, Interim HealthCare procured the interceptions for the purpose of using and disclosing users' individually identifiable health information to third parties for commercial advantage without authorization, in violation of HIPAA, 42 U.S.C. § 1320d-6. A disclosure that violates HIPAA is a violation of law independent of the ECPA. At minimum, whether Interim HealthCare acted with that unlawful purpose is a fact-intensive question that should be resolved on a complete evidentiary record. *See Stein v. Edward-Elmhurst Health,* 2025 WL 580556, at *4 (N.D. Ill. Feb. 21, 2025); *W.W. v. Orlando Health, Inc.,* 2025 WL 722892, at *6–7 (M.D. Fla. Mar. 6, 2025); *Kurowski v. Rush Sys. for Health,* 2023 WL 2349606 (N.D. Ill. Mar. 3, 2023). Interim HealthCare's knowing violation of HIPAA is supported by, among other things, its own publication of a Notice of Privacy Practices and its awareness of the HHS Office for Civil Rights guidance warning that tracking technologies on healthcare websites that transmit PHI without a valid Business Associate Agreement violate HIPAA.

130.    That Interim HealthCare may have been motivated by commercial purposes does not preclude application of the crime-tort exception. *See Stein,* 2025 WL 580556, at *6 ("The language of the statute gives no hint that conduct falls outside the reach of the statute if a person acted based on financial motivations.").

131.    Interim HealthCare intentionally procured Google and Microsoft to intercept these electronic communications by deliberately implementing the Trackers on its Website, within the meaning of 18 U.S.C. § 2511(1)(a). Users did not consent to Interim HealthCare's procurement of third-party interception or to the sharing of their location and service searches, medical-condition research, Contact Us submissions, search-bar queries, and associated identifiers for advertising, analytics, retargeting, or conversion-optimization purposes.

132. Interim HealthCare was not acting under color of law when procuring these interceptions, and no other exception to ECPA liability applies.

133. As a direct result of Interim HealthCare's violations, Plaintiffs and Class Members are entitled to: (a) actual damages, or statutory damages of the greater of $100 per day per violation or $10,000; (b) punitive damages; and (c) reasonable attorneys' fees and costs. 18 U.S.C. § 2520.

## COUNT III
### Unjust Enrichment
### (On Behalf of Plaintiffs and the Nationwide Class)

134. Plaintiffs incorporate paragraphs 1–114 above as if fully set forth herein and bring this Count individually and on behalf of the proposed Nationwide Class.

135. Interim HealthCare received a benefit from Plaintiffs and Class Members by inducing them to provide valuable personal and health-related data through the Website's location-search, service, resources, Contact Us, and search functions, and then using the Trackers to exploit that data for its business purposes.

136. By implementing the Trackers on its Website, Interim HealthCare obtained analytics, conversion measurement, retargeting, audience-building, advertising attribution, and lead-generation benefits. Those benefits enabled Interim HealthCare to qualify and route leads to its offices and franchisees, improve advertising efficiency, and increase the volume of care referrals and services, thereby enriching itself at the expense of Plaintiffs and Class Members.

137. Private information, at least in the context of sensitive health-related information, has value. *See W.W. v. Orlando Health, Inc.,* 2025 WL 722892, at *10.

138. Interim HealthCare knowingly accepted and retained these benefits under circumstances that make it inequitable to do so without paying the value of the data and commercial benefits obtained from Plaintiffs and Class Members.

139.     It would be unjust and inequitable to allow Interim HealthCare to retain the benefits of its unlawful conduct. Plaintiffs and Class Members are entitled to restitution and disgorgement of all profits, benefits, and other compensation obtained by Interim through its wrongful conduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all other Class Members similarly situated, respectfully requests that this Court:

(a) Certify this case as a class action on behalf of the proposed Class, appoint Plaintiffs as class representatives, and appoint Plaintiffs' counsel as class counsel;

(b) Declare that Interim HealthCare's actions, as described herein, violate the FSCA and the ECPA and constitute unjust enrichment;

(c) Award Plaintiffs and the Class compensatory damages in an amount to be determined at trial;

(d) Award Plaintiffs and the Class statutory damages as provided by the FSCA and the ECPA;

(e) Award Plaintiffs and the Class punitive damages;

(f) Award Plaintiffs and the Class restitution and disgorgement of all profits, benefits, and other compensation Interim HealthCare obtained through its wrongful conduct;

(g) Award injunctive relief requiring Interim HealthCare to cease procuring the interception of Website users' communications without proper consent; to disable or segregate the Trackers from its location-search, service, resources, Contact Us, search, and other health-related functions unless valid consent and authorization are obtained; to request deletion of improperly transmitted data from the Third-Party Recipients to

45

the extent within Interim HealthCare's control or contractual rights; and to implement appropriate safeguards to protect Website users' privacy in the future;

(h) Award Plaintiffs and the Class pre-judgment and post-judgment interest;

(i) Award Plaintiffs and the Class reasonable attorneys' fees and costs, as allowed by law; and

(j) Grant such other and further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury on all claims and issues so triable.

Dated: August 7, 2026

Respectfully submitted,

*By: /s/ Adam A. Schwartzbaum*
Adam A. Schwartzbaum, Esq.
Florida Bar No. 93014
SCHWARTZBAUM
14 NE 1st Ave Ste 705
Miami, FL 33132
Telephone: 786-453-8485
Primary Email: adam@schwartzbaum.com
Secondary Email: admin@schwartzbaum.com

Counsel for Plaintiffs and the Proposed Class